J-S14002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 116 WDA 2022 |

Appeal from the Order Entered December 29, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-15-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 117 WDA 2022 |

Appeal from the Order Entered December 29, 2021
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  CP-02-AP-0000016-2021

BEFORE:   McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED: AUGUST 8, 2022**

S.M. ("Mother") appeals from the order terminating her parental rights

as to her minor children, S.H. and A.H. ("Children"). We affirm.

S.H. and A.H. were born in 2016 and 2018, respectively. On May 22,

2018, the Office of Children Youth and Family Services ("CYF") received a

---

[*] Retired Senior Judge assigned to the Superior Court.

referral following A.H.'s birth of concerns of maternal substance abuse and ongoing intimate partner violence between Mother and Children's father, D.H. ("Father"). N.T., 10/15/21, at 36. While CYF was investigating that referral, seven-week-old A.H. was transported to Children's Hospital of Pittsburgh on July 9, 2018 for injuries he sustained during a fight between Mother and Father. *Id.* at 36-37. Mother reported that she and Father had gotten into a physical fight the prior day, and Father hit A.H. because he was crying. *Id.* at 37. Mother was observed to have marks around her neck and she reported that Father hits both Children. *Id.* Mother refused to agree to a safety plan that included having Father leave the home because she stated she needed Father's help with Children. *Id.* at 37-38. Father was arrested due to A.H.'s injuries. *Id.* at 37. A child line report was filed and determined to be "indicated" against both parents, meaning there was enough evidence to find child abuse. *Id.* at 42. Mother was considered to be a perpetrator by omission. *Id.* at 64. Children were removed from their parents' care and placed in the care of their paternal great aunt. *Id.* at 59. They have remained in this pre-adoptive home since their removal. *Id.*

The court adjudicated Children dependent on November 2, 2018. *Id.* at 41. Mother stipulated to the facts in the dependency petition, including that there was a domestic violence situation between her and Father during which A.H. sustained injuries. *Id.* at 41. Approximately two years and three months after the adjudication of dependency, on January 21, 2021, CYF filed petitions for involuntary termination of Mother's parental rights. The court held a

hearing on the petitions on October 15, 2021. CYF presented the testimony of A.H.'s treating physician, Dr. Jennifer Clarke; CYF supervisor, Derricka Gritten; CYF caseworker, Melissa Fuchs; foster mother, Beverly Wilson; and Officer Christopher Koll. Mother did not testify or call any witnesses.

Dr. Clarke, a physician at the Children's Hospital of Pittsburgh in the Division of Child Advocacy, testified that she was involved in A.H.'s care when he was admitted to the hospital following the domestic violence incident. *Id.* at 25. Dr. Clarke stated that A.H. had 14 rib fractures, at least three metaphyseal fractures in his legs, brain injuries, a broken blood vessel in his eye, and significant facial, head and ear bruising. *Id.* at 27. Dr. Clarke said that the rib fractures had occurred at separate times. *Id.* at 27-28. She testified that Mother reported that Father caused A.H.'s injuries and described how Father "hit the baby in the ribs, smacked his face and smacked his butt." *Id.* at 28. Dr. Clarke stated that Mother admitted that Father had slapped her, scratched her neck, and ripped her shirt that morning. *Id.* She said that Mother reported that once Father was released from prison, she would need him near her because she could not take care of Children by herself. *Id.* at 29. Dr. Clarke testified that A.H.'s injuries were diagnostic of physical child abuse. *Id.* at 28. She opined that given A.H.'s age and injuries, he would be at risk for further injuries, including death, if he were returned to the same environment where he sustained those injuries. *Id.* at 29.

Derricka Gritten, the CYF casework supervisor assigned to this case, testified that Mother's goals were mental health, intimate partner violence

treatment, parenting, and visitation. *Id.* at 44. Gritten stated Mother participated in three evaluations with Dr. Patricia Pepe, but she did not follow through on any of Dr. Pepe's recommendations. *Id.* at 44-45. Gritten said that Mother began group therapy at Mercy Behavioral Health in December 2019. *Id.* at 48. However, she said that there was no record that Mother participated in anything other than this one group session and the CYF record did not contain any documentation that Mother completed any form of mental health treatment. *Id.* at 48-49.

Gritten testified that although Mother had completed the intimate partner violence program at the Women's Center and Shelter in December 2020, she had failed to complete the overall goal of intimate partner violence treatment because CYF believed that Mother still had an ongoing relationship with Father. *Id.* at 49-50. Gritten specifically noted the following history. On July 23, 2018, while the CYF caseworker was speaking with Mother on the phone, a male voice was heard in the background. Later, on August 14, 2018, the caseworker texted Father's phone and Mother responded to the text, and on February 15, 2019, Mother picked up bus tickets for both herself and Father. In addition, Mother and Father were both arrested in December 2019 following a domestic dispute, and the caseworker saw Mother and Father together in August 2021 going into a bar together. *Id.* at 53-54.

Gritten indicated that Mother has maintained since the initial filing of the case that she has not reunited with Father. *Id.* at 66. Gritten stated that the main concern in this case is Mother's inability to keep Children safe from any

further abuse by Father. *Id.* at 56. She testified that "[t]here is no evidence to say that [M]other can or will keep the [C]hildren away from [F]ather[, w]ho has both physically abused both [C]hildren and [M]other." *Id.* Gritten noted that the charges against Father for the abuse of A.H. were dropped because Mother refused to cooperate with the prosecution. *Id.*

For Mother's parenting goal, she was required to participate in coached and supervised visits. *Id.* at 54. Gritten testified that Mother completed the coached visitation programs at Arsenal and A Second Chance, in January 2019 and June 2019, respectively. *Id.* However, Gritten stated that Mother refused to participate in the coached visitation program at Project Star. *Id.* at 54-55. Gritten said that throughout the case, Mother had some periods of time when she visited Children regularly and some periods of time where she did not visit. *Id.* at 55. Gritten testified that during the COVID-19 shutdown, Mother was offered access to a phone and computer to virtually visit Children, but she refused virtual visits between March 2020 and September 2020. *Id.* Gritten stated that Mother has never progressed to unsupervised visitation of Children. *Id.*

Gritten testified that Children are bonded to their foster mother and are very comfortable in her home. *Id.* at 59. She noted that A.H., in particular, who was only seven weeks old when he was placed in her home, is extremely affectionate with the foster mother and refers to her as "mom." *Id.* Gritten indicated the foster mother is meeting all of Children's educational, psychological, and developmental needs, while Mother is not meeting those

needs. *Id.* at 60. While Gritten said there is a bond between Mother and S.H., "the safety of the [C]hildren outweighs any bond that the [C]hildren might have" with Mother. *Id.* at 60, 63. Gritten agreed that termination would have "some" effect on S.H., but it would not be detrimental to her in any way. *Id.* at 61, 65. Gritten testified that termination of parental rights would best serve the needs and welfare of Children and would allow Children to remain protected from any further abuse and to no longer be exposed to domestic violence. *Id.* at 60.

Fuchs, the current caseworker assigned to the case, testified that CYF conducted a diligent search in September 2021 to locate Father and Father was found to be using Mother's address and was being claimed under Mother's Department of Welfare benefits. *Id.* at 71. Fuchs stated that she had safety concerns if Children were to return to Mother's care and it would be a "high risk situation" since Mother was still having contact with Father. *Id.* at 77, 82. She stated that although Mother completed two months of domestic violence sessions, Mother currently denies that any domestic violence ever occurred between her and Father and denies that either of them were responsible for A.H.'s injuries. *Id.* at 77. Fuchs noted that Mother has consistently denied that she has maintained a relationship with Father despite evidence to the contrary. *Id.* at 77, 79.

Fuchs further testified that she has observed "a very good and positive bond" between Children and the foster mother. *Id.* at 75. She stated that they spontaneously show affection with each other, and Children are happy in the

foster mother's home. *Id.* at 74, 75. Fuchs testified Children have been in the foster mother's home for over three years and it is the only home A.H. has known. *Id.* at 77. Fuchs stated that the foster mother attends Children's therapy sessions and is able to take care of all of their needs. *Id.* at 75, 77.

Wilson, Children's foster mother, testified that she saw Mother and Father together in the parking lot of a supermarket in December 2020. *Id.* at 84-85. She stated that she has a Protection from Abuse order against Father for making threats against her. *Id.* at 86. Wilson testified that she "absolutely" wants to adopt Children. *Id.* at 87.

Officer Koll, from the Pittsburgh Police Department, testified that he arrested Mother and Father for domestic violence on December 17, 2019. *Id.* at 18-19. He observed injuries on both Mother and Father and due to conflicting statements, both parents were arrested. *Id.* at 19. Officer Koll stated that the address given for both Mother and Father was the same and the incident occurred while they were lying in bed together. *Id*. at 19-20.

Children's counsel indicated that S.H. was agreeable with reducing the visits with Mother. *Id.* at 93. Counsel stated that A.H. was too young to articulate a position, but she recommended that it would be in his best interest to be adopted. *Id.* at 93-94.

The trial court found that CYF proved by clear and convincing evidence that Mother's parental rights should be terminated under Section 2511(a)(2), (5), and (8) and Section 2511(b) of the Adoption Act. Mother filed a notice of appeal. Mother raises the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hild[ren] pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Br. at 8.

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018) (citation omitted). In termination cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *In re Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of

the precise facts in issue." *Id.* (internal quotation marks and citation omitted in original).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Mother first contends that the court erred in terminating her parental rights under Section 2511(a). Mother argues that she completed intimate partner violence treatment and has maintained that she is no longer in a relationship with Father. Mother's Br. at 17. She contends that the testimony at the termination hearing showed that despite the several reported accounts of contact between Mother and Father, there had not been any further

incidents of domestic violence between them. ***Id.*** at 17, 23. She submits that "the intimate partner violence treatment was effective and that was evidenced by the lack of violent contact between her and Father despite her having continued contact." ***Id.*** at 23.

The court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), and (8). As only one basis for termination under Section 2511(a) is necessary, we will focus our attention on the court's termination of Mother's parental rights pursuant to Section 2511(a)(8), which states:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Section 2511(a)(8) "sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." ***In re A.R.***, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been proven, the court "must next determine whether the conditions that led to the child's removal continue to exist." ***Id.*** "As a result, the relevant inquiry in this regard is whether the conditions that led to removal have been remedied and

thus whether reunification of parent and child is imminent at the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa.Super. 2009). "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." ***In re Z.P.***, 994 A.2d 1108, 1118 (Pa.Super. 2010).

Here, it is undisputed that at the time of termination hearing, Children had been out of Mother's care for 39 months. Therefore, we next focus our inquiry on whether the conditions that led to Children's removal from Mother's care continued to exist at the time the court terminated Mother's parental rights.

The court found that the conditions that existed at the time of Children's placement continued to exist at the time of the termination hearing. Conclusions of Law, filed 12/29/21, at ¶ 3. The court noted that Mother did not complete intimate partner violence until December 2020, over two years after Children were removed from her care. Findings of Fact, filed 12/29/21, at ¶ 9. The court emphasized that there is ongoing concern regarding this goal because Mother currently denies any domestic violence ever occurred with Father and the testimony revealed that Mother and Father were still in contact. ***Id.*** The court opined:

> This concern has manifested into an [ongoing] incapacity on the part of the subject [M]other in failing to understand the importance and the reality of maintaining safety for her [C]hildren in light of the circumstances and development

- 11 -

clearly set-forth in the record beginning with the injuries sustained by [A.H.].

*Id.*

In addition, the court noted that Mother failed to complete mental health treatment and Mother's visits with Children were inconsistent and never progressed to unsupervised. *Id.* at ¶¶ 9, 10. The court specifically found the testimony of Dr. Clarke, Gritten, Fuchs, Wilson, and Officer Koll to be credible. *Id.* at ¶¶ at 5, 9, 15. The court concluded that Mother had not remedied the original reasons for placement in a reasonable amount of time.

We discern no abuse of discretion. The record supports the court's finding that the conditions which led to Children's removal from Mother's home continue to exist. The conditions which led to removal were domestic violence and Mother's unaddressed mental health. The record shows that Mother failed to complete mental health treatment and took over two years to complete intimate partner violence treatment. It was evident that despite completing intimate partner violence treatment, Mother has failed to understand the importance of protecting Children from further abuse by continuing to have a relationship with Father. Mother refused to agree to a safety plan that included removing Father from the home and Mother failed to press charges against Father for the abuse of A.H.

Additionally, Officer Koll testified that Mother and Father were both arrested in December 2019, well after Children were removed from their care, following a domestic violence incident. Mother no longer acknowledges

domestic violence with Father and denies that either parent is responsible for A.H.'s injuries, despite her earlier admissions to the contrary. Gritten testified that there is no evidence to say that Mother can or will keep Children away from Father. There was evidence presented that Father and Mother are still living together. This is the same environment that existed when Children were removed. Dr. Clarke opined that Children would be at a risk for further injuries, including death, if returned to the same environment.

Furthermore, Children cannot linger in care waiting for Mother to be in a position to meet Children's needs. This Court has explained:

> We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. . . .However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

Because Mother failed to remedy the situation that led to Children's removal from her care, and, as discussed below, termination of parental rights would best serve the needs and welfare of Children, we find the trial court properly concluded that the requirements of Section 2511(a)(8) were satisfied.

Mother next maintains that CYF failed to present clear and convincing evidence that termination best served the needs and welfare of Children pursuant to Section 2511(b). Mother argues that she has a bond with Children, especially with S.H. Mother's Br. at 26. She contends that "CYF declined to offer any evidence from an expert witness regarding whether termination of Mother's parental rights would best serve the needs and welfare" of Children. *Id.* at 27-28.

Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). This inquiry involves assessment of "[i]ntangibles such as love, comfort, security, and stability[.]" *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." *Id.* However, the "mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the trial court must consider whether severing the bond "would destroy an existing, necessary and beneficial relationship." *Id.* (citation and internal quotation marks omitted). When assessing the bond, "the court is not required to use expert testimony." *In re Z.P.*, 994 A.2d at 1121. Indeed, a court may rely upon the observations of social workers and caseworkers. *Id.* The court must also examine any pre-adoptive home and

- 14 -

any bond between the child and the foster parents. **In re T.S.M.**, 71 A.3d 251, 268 (Pa. 2013).

Here, the court concluded that Children's emotional, developmental, and physical needs would best be served by terminating Mother's parental rights and allowing Children to be adopted. Conclusions of Law, at ¶ 4. The record supports the court's finding. There was ample testimony that Children are strongly bonded to their foster mother, are very happy in her home, and are thriving in her care. Although there was evidence that S.H. has a bond with Mother, the court found that any existing bond could be severed without detrimental effects on Children and was outweighed by the serious safety concerns in this case. Findings of Fact, at ¶¶ 12, 14. Contrary to Mother's contention, expert testimony is not required when determining whether a bond exists and whether termination would best serve Children's needs and welfare under Section 2511(b). **See In re Z.P.**, 994 A.2d at 1121. CYF provided clear and convincing evidence that termination of Mother's parental rights would be in Children's best interest, and we affirm the court's order terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/8/2022